UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA FOREST ALLIANCE, | ) | |
| INDIANA INTERCHURCH CENTER, | ) | |
| VETERANS IN INDUSTRY AND ARTS, | ) | |
| GARY MOODY, | ) | |
| CLARK KAHLO, | ) | No. 1:16-cv-03297-JMS-MPB |
| FELICITY KELCOURSE, | ) | |
| KAPPA DELTA PI, INTERNATIONAL | ) | |
| HONOR SOCIETY IN EDUCATION, | ) | |
| MARY T. BOOKWALTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT A. MCDONALD Secretary of | ) | |
| Veterans Affairs, | ) | |
| U.S. DEPARTMENT OF VETERANS | ) | |
| AFFAIRS, | ) | |
| RONALD E. WALTERS Interim Under | ) | |
| Secretary for Memorial Affairs, National | ) | |
| Cemetery Association, | ) | |
| NATIONAL CEMETERY ASSOCIATION, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, who the Court will collectively refer to as the Indiana Forest Alliance ("IFA"),

challenge Defendants' purchase of and proposed plan to use a heavily-wooded section of Crown

Hill Cemetery for a cemetery expansion project to build columbaria to house the remains of

Veterans (the "Project") as part of Crown Hill National Cemetery.[1]  IFA argues that the process

---

[1] "Columbaria" are structures with wall niches that house cremated remains.  *See* Oxford English Dictionary Online, *available at* http://www.oed.com (last visited January 12, 2017).  Crown Hill National Cemetery is on property owned by the VA within the privately-owned Crown Hill Cemetery.  *See* National Cemetery Administration, Crown Hill National Cemetery information page, *available at* http://www.cem.va.gov/cems/nchp/crownhill.asp (last visited January 12, 2017).  Crown Hill National Cemetery is currently "closed to new interments."  *Id.*

Defendants used to analyze the environmental effects of the Project on the 14.75 acres of land at issue (the "Property") violated the National Environmental Policy Act ("NEPA"). IFA seeks judicial review of that process under the Administrative Procedures Act ("APA"), and it asks for a preliminary injunction to stop Defendants from beginning to clear trees on the Property.

For the reasons that follow, the Court denies IFA's request for a preliminary injunction. IFA overlooks the limited scope of this Court's administrative review, overstates the impact of the Project, and minimizes or even disregards the extensive process the Defendants utilized to solicit feedback and determine the environmental impact of the Project on the Property. Additionally, despite bearing the burden to support its injunction request, IFA assumes the public interest element of the analysis in its favor—without proof—and completely ignores that Crown Hill National Cemetery is currently at capacity and cannot accept additional Veterans for burial. IFA also ignores that Defendants reviewed the environmental impact of the Project after soliciting feedback pursuant to NEPA and made the decision to move forward with the Project after issuing a comprehensive analysis and making the report available to the public in various ways. IFA improperly asks this Court to second-guess that decision, which it cannot do within the context of administrative review. Because IFA has not met its burden to prove that a preliminary injunction is appropriate, its request must be denied.

## I.
### PRELIMINARY INJUNCTION STANDARD

"To obtain a preliminary injunction, the moving party must show that its case has 'some likelihood of success on the merits' and that it has 'no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied.'" *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011)). "If the moving party meets these threshold requirements, the district court 'must consider

2

the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied.'" *Stuller*, 695 F.3d at 678 (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). "The district court must also consider the public interest in granting or denying an injunction." *Stuller*, 695 F.3d at 678.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "Preliminary relief is properly sought only to avert irreparable harm to the moving party." *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006). Because the merits of the underlying litigation are not at issue at this stage, "'the reluctance to disturb the status quo prior to trial on the merits is an expression of judicial humility . . . [that] enables the court to stay relatively neutral in the underlying legal dispute.'" *Id.* at 945-46 (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1012 (10th Cir. 2004)).

## II.
### BACKGROUND

The United States Department of Veterans Affairs (the "VA") oversees the National Cemetery Administration (the "NCA"), which is "responsible for the interment of deceased servicemembers and veterans." 38 U.S.C. § 2400. The VA may purchase additional land as needed for national cemeteries. 38 U.S.C. § 2406.

To better meet the burial needs of Veterans, the NCA began an Urban Initiative to establish new columbaria-only cemeteries in five urban locations, including Indianapolis. [Filing No. 26 at 3 (citing Statement of NCA Deputy Under Secretary Glenn Powers ("The Powers Statement") (available at http://docs.house.gov/meetings/vr/vr09/20131030/101410/hhrg-113-vr09-wstate-powersg-20131030.pdf (last visited Jan. 12, 2017)).] The goal of the Urban Initiative is to alleviate

time and distance challenges for deceased Veterans' families to allow for a more convenient burial option. [Filing No. 26 at 3 (citing The Powers Statement).]

As part of the Urban Initiative, the VA sought to purchase 14.75 acres of land to expand the current Crown Hill National Cemetery in Indianapolis.[2] [Filing No. 20-6 at 24.] In December 2013, the NCA solicited the opinions of eleven state and federal agencies as part of the early coordination phase of the environmental review process. [Filing No. 20-6 at 13-25.] These entities included the Indianapolis Metropolitan Planning Organization, the Indiana Department of Environmental Management, the Indiana Department of Natural Resources, the Natural Resources Conservation Service based in Indianapolis, the Environmental Geology Section of the Indiana Geological Survey, the Indiana Department of Transportation, the National Park Service, the United States Department of Housing and Urban Development, the United States Fish and Wildlife Service, the Federal Highway Administration, and the United States Army Corps of Engineers. [Filing No. 20-6 at 22-23.] The Early Coordination Packet specifically identified the Property sought for the cemetery expansion Project. [Filing No. 20-6 at 24.] It included pictures of the area and described the location as "heavily wooded with numerous shagbark hickory, oak, and cottonwood trees (among others) comprising the overstory. There is a dominance of invasive honeysuckle shrubs as well." [Filing No. 20-6 at 24.] The Early Coordination Packet described the Project as follows:

---

[2] To assist it with doing so, the VA and the NCA engaged ASC Group, Inc. ("ASC")—a cultural and environmental consultant. [*See, e.g.*, Filing No. 20-6.] The Court will exclusively refer to the VA and the NCA unless specific actions or recommendations by ASC are referenced.

- Vegetation removal: There will be both clear cutting and selective removal of trees. There will be removal of portions of the forested areas to create an entrance and roadway system to accommodate the construction of columbarium walls, a main flagpole area, and a small public information/restroom building. Tree removal will take place in areas where the cemetery development will occur. The cemetery will be developed in phases, with each phase accommodating approximately 10 years of cremations capacity. Existing forested areas will be removed as each phase of development occurs; there will be some tree buffers and forested areas that are left undisturbed to retain the character and serenity of the site.
- The national veteran burial grounds cemetery planned for this site does not include any type of in ground burials; it is to be developed for aboveground columbarium niche walls.

[Filing No. 20-6 at 24.] Recipients of the Early Coordination Packet were asked to respond within thirty days, although extensions could be accommodated. [Filing No. 20-6 at 25.]

In response to the Early Coordination Packet, the NCA received multiple responses. [*See* Filing No. 20-22 at 50-53 (summary of responses).] For example, the United States Department of Fish and Wildlife Services ("USFWS") responded on December 27, 2013, noting that the Project was within the range of two types of federal endangered bats. [Filing No. 20-6 at 35.] USFWS concluded that the Project "will not eliminate enough habitat to affect this species," but it asked that "tree-clearing be avoided during the period April 1 - September 30" to "avoid incidental take from removal of an occupied roost tree." [Filing No. 20-6 at 35.] As long as tree-clearing was avoided during the identified period, USFWS concluded that "the proposed project is not likely to adversely affect this listed species." [Filing No. 20-6 at 35.]

The Indiana Department of Natural Resources ("IDNR") responded on January 14, 2014. [Filing No. 20-22 at 51.] It stated that "no protected plants or animals have been documented in the vicinity of the proposed project area." [Filing No. 20-22 at 51.] It did, however, express "concern for the significant impact to resident wildlife and migratory birds due to the loss of breeding and stop-over habitat." [Filing No. 20-22 at 51.] IDNR provided several recommendations for avoidance, minimization, and mitigation. [Filing No. 20-22 at 51.]

The Indiana Department of Environmental Management ("IDEM") responded on December 16, 2013. [Filing No. 20-22 at 52.] It stated that there had been a previous wetland delineation on the site and that a new survey would be necessary. [Filing No. 20-22 at 52.] It also noted that "previous development proposals of the property generated public outcry from surrounding neighborhoods." [Filing No. 20-22 at 52.]

In February 2014, ASC issued a report concluding that the cemetery expansion Project would be a "categorical exclusion" not necessitating an environmental assessment ("EA"). [Filing No. 20-6.] ASC specifically acknowledged that prior proposed construction projects on the site had involved private residential development and resulted in public controversy. [Filing No. 20-6 at 4.] It concluded that the Project "is an appropriate use of the property that is unlikely to garner public controversy given that it is within the existing Crown Hill Cemetery grounds." [Filing No. 20-6 at 4.]

On June 19, 2015, an updated wetland survey was prepared for the Property. [Filing No. 20-4.] It concluded that there were "no identified national wetlands in the vicinity of the project area" per USFWS. [Filing No. 20-4 at 3.] Rather, three isolated wetlands—each less than one acre in size—were identified on the Property. [Filing No. 20-4 at 4-7.] The wetland survey concluded that "[e]very effort should be taken to avoid impacts to these aquatic resources." [Filing No. 20-4 at 8.]

Despite ASC's conclusion that an EA was not necessary, a draft EA was prepared on June 27, 2015. [Filing No. 20-10; see also Filing No. 20-19 at 1 (email indicating that because "public involvement is an important aspect of this project and should be considered," VA officials wanted to pursue an EA instead of a categorical exclusion for the proposed Project).] The EA analyzed two alternatives—the proposed action of the VA purchasing the Property for the Project or a "no

action" alternative of not purchasing the Property.  [Filing No. 20-10 at 4.]  The EA analyzed various considerations between the proposed action and the no action alternative, including environmental consequences, cultural resources, wildlife and habitat, land use, geology, community services, and the cumulative impacts.  [Filing No. 20-10 at 5-6 (summary table of impact analysis).]  Ultimately, the EA concluded that "no significant impacts would be associated with the Proposed Action."  [Filing No. 20-10 at 11.]

Copies of the draft EA were placed at the Central Branch of the Indianapolis Public Library, the College Avenue Branch of the Indianapolis Public Library, and at Crown Hill Cemetery. [Filing No. 20-33 at 6.]  Additionally, the following Notice of Availability was published in the *Indianapolis Star* newspaper from July 22, 2015 until August 1, 2015:

NOTICE OF AVAILABILITY
DRAFT ENVIRONMENTAL ASSESSMENT
U.S. DEPARTMENT OF VETERANS AFFAIRS
Proposed property acquisition for cemetery expansion and
development of Crown Hill National Cemetery in
Indianapolis, Marion County, Indiana

The Department of Veterans Affairs (VA) announces the
preparation and availability of a Draft Environmental Assessment
(DEA) for the proposed property acquisition for cemetery expansion
and development of the Crown Hill National Cemetery within the
existing Crown Hill Cemetery in Indianapolis, Indiana. The DEA has
been prepared in accordance with the regulations for
implementing the procedural provisions of the National
Environmental Policy Act (NEPA), (Public Law 91-190, 42 USC 4321-
4347 January 1, 1970), amendments, and VA's Implementing
Regulations (38 CFR Part 26). The VA intends to issue a Finding of
No Significant Impact (FONSI) following a 30-day comment period
in accordance with the Council on Environmental Quality
Regulations for Implementing NEPA, Section 1508.13, provided
there are no substantive comments which warrant further
evaluation. The public comment period will end on August 7, 2015.
The DEA is available for review at Indianapolis Public Library -
Central Library located at One Library Square, 40 East Saint Clair
Street, Indianapolis, Indiana 46204; and the Indianapolis Public
Library - College Avenue Branch located at 4180 North College
Avenue, Indianapolis, Indiana 46205. Please submit written
comments to the following:

Department of Veterans Affairs
Attn: Mr. Paul Rau, VA Project Manager
425 I Street, NW
Washington, D.C. 20001
Fax: (202) 632-58-31
E-mail: paul.rau@va.gov
(Please place "Crown Hill National Cemetery" in the
subject line)

(S - 7/22/15, 7/23/15, 7/24/15,7/25/15, 7/27/15, 7/28/15, 7/29/15,
7/30/15, 7/31/15, 8/1/13 - 0000601870)

[Filing No. 20-33 at 6.]

No comments or requests to extend the public comment period were received following the Notice of Availability of the draft EA. [Filing No. 26 at 6.] On September 8, 2015, the VA and NCA issued the final EA and a Finding of No Significant Impact ("FONSI"). [Filing No. 20-36.] The following Notice of Availability regarding the EA and FONSI was published in the *Indianapolis Star* newspaper from September 12, 2015 until September 21, 2015:

## NOTICE OF AVAILABILITY
### FINAL ENVIRONMENTAL ASSESSMENT
### AND
### FINDING OF NO SIGNIFICANT IMPACT
### U.S. DEPARTMENT OF VETERANS AFFAIRS
### Proposed property acquisition for cemetery expansion and development of Crown Hill National Cemetery in Indianapolis, Marion County, Indiana

Pursuant to Section 102 (2) (c) of the National Environmental Policy Act (NEPA) of 1969, as implemented by the Council on Environmental Quality (CEQ) regulations (40 CFR Parts 1500-1508), the U. S. Department of Veterans Affairs (VA) gives notice that an Environmental Assessment (EA) has been prepared and a Finding of No Significant Impact (FONSI) has been issued for the proposed property acquisition for cemetery expansion and development of the Crown Hill National Cemetery within the Crown Hill Cemetery in Indianapolis, Indiana.

Under the Proposed Action, VA would purchase a 14.75-acre wooded parcel north of the existing national cemetery. The proposed expansion project would create an entrance and roadway system to accommodate the construction of columbarium walls, a main flagpole area, and a small public information and restroom building. The cemetery would be developed in phases with each phase accommodating approximately 10 years of cremation capacity. Existing forested areas will be removed as each phase of development occurs; there will be some tree buffers and forested areas left undisturbed to retain the character and serenity of the site.

The purpose of the Proposed Action is to continue to enable the NCA to provide eligible Veterans and their families with a national cemetery of sufficient size and capacity to serve the projected needs in the central Indiana region for the next 100 years.

The EA identifies, analyzes, and documents the potential physical, environmental, cultural, and socioeconomic impacts associated with the VA's Proposed Action. The EA also evaluates the potential direct, indirect, and cumulative impacts resulting from the Proposed Action. The Proposed Action and the No Action Alternative are considered. Based on information gathered during preparation of the EA, VA finds that implementation of the Proposed Action would not have a significant impact.

The FONSI and EA addressing this action may be obtained by interested parties at http://www.crownhill.va.gov or by contacting the Department of Veterans Affairs, Attn: Mr. Paul Rau, VA Project Manager, 425 I Street, NW, Washington, D.C. 20001. Phone (202) 632-9653. E-mail: paul.rau@va.gov. Please be advised the public has 30-days to respond from the date of this publication with comments. The public comment period will end on October 13, 2015.

(S - 9/12/15 - 0000719272)

[Filing No. 20-33 at 3.]

The VA closed on the Property with Crown Hill Cemetery on September 21, 2015. [Filing No. 20-5 at 1.] On December 7, 2016, IFA sued multiple Defendants, including the VA and the NCA. [Filing No. 1.] It brings its action pursuant to NEPA, asking this Court to administratively review the allegedly flawed process Defendants used to prepare the EA and issue the FONSI.[3] [Filing No. 1 at 6.]

On December 21, 2016, IFA moved for a preliminary injunction, asking this Court to halt Defendants' plan to begin clearing trees on January 15, 2017 for the Project. [Filing No. 17; Filing No. 18 at 3.] As Defendants point out in opposing the preliminary injunction request, they must start clearing trees for the Project soon to avoid the roosting period of an endangered bat that begins on April 1, 2017. [Filing No. 26 at 33.] The Court will now address the merits of IFA's injunction request.

### III.
### DISCUSSION

IFA asks this Court to enter a preliminary injunction in its favor and order Defendants not to clear any trees on the Property from the date of the injunction forward. [Filing No. 17; Filing No. 18.] Defendants object to that request. [Filing No. 26.] The Court will first set forth the scope of its administrative review and then turn to the merits of the parties' arguments.

---

[3] Defendants do not challenge Plaintiffs' standing to bring this action. Nevertheless, standing to bring a NEPA challenge "should be examined even where, as here, the defendant does not dispute it." *Indiana Forest Alliance, Inc. v. U.S. Forest Service*, 325 F.3d 851, 855 (7th Cir. 2003). While an alleged procedural injury is insufficient, allegations that plaintiffs use the property, that defendants' decision will diminish their use of the property, and that the alleged failure to permit them to participate in public review caused them harm is enough to establish Article III standing. *See Ind. Forest*, 325 F.3d at 855 (citing *Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998)). In their Complaint, Plaintiffs set forth lengthy allegations about how each of them use the Property and will be affected by the plan to alter it. [Filing No. 1 at 7-15.] They also allege that none of them had notice of the project before the FONSI was issued. [Filing No. 1 at 7-15.] The Court finds Plaintiffs' allegations sufficient to establish their standing at this time.

### A. Limited Scope of Court's Administrative Review

It is well-established that "review in federal court of decisions entrusted to administrative agencies is deferential and thus very limited in scope." *Howard Young Med. Ctr. Inc. v. Shalala*, 207 F.3d 437, 441 (7th Cir. 2000). The Court's review of agency action under NEPA is governed by the Administrative Procedures Act ("APA"). *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003). "The APA instructs courts to set aside agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). To determine whether an agency action is arbitrary or capricious, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *Ind. Forest All.*, 325 F.3d at 859 (citations omitted). The Court reviews the administrative record and focuses "primarily on whether the agency considered the relevant data and offered a satisfactory explanation for its action." *Howard*, 207 F.3d at 441. The Court "look[s] only for a rational connection between the facts the agency found and the decision it made[,]" and it is "not permitted to reweigh the evidence or to substitute [its] own judgment for that of the administrative agency." *Id.*

"In the context of NEPA, arbitrary and capricious review prohibits a court from substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions." *Highway J*, 349 F.3d at 953; *see also Ind. Forest All.*, 325 F.3d at 859 ("If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference."). "In fact, the only role for a court in applying the arbitrary and capricious standard in the NEPA context is to insure that the agency has taken a hard look at environmental

consequences." *Highway J*, 349 F.3d at 953 (citations omitted). The hard look inquiry focuses on the full administrative record at the time of the challenged decision. *Id.* at 958.

### B. Likelihood of Success on the Merits

IFA challenges the process Defendants utilized to prepare the EA and issue a FONSI, arguing that the process was arbitrary and capricious, an abuse of discretion, and not in accordance with the law. [Filing No. 21 at 5.] Specifically, IFA contends that Defendants should have prepared an environmental impact statement ("EIS"), that they failed to adequately notify the public of the Project, and that they failed to take a hard look at alternatives.[4] [Filing No. 21 at 5-26.] The Court will address IFA's likelihood of success with regard to each of these arguments in turn.

#### 1) Decision to Prepare an EA rather than an EIS

IFA argues that Defendants should have prepared an EIS because the Project is a major federal action that will significantly impact the quality of the human environment in the area. [Filing No. 21 at 16.] It claims that the Project "will clear and transform virtually all of this old growth Forest into a manicured combination of lawn, pavement, building, and cement" and that Indianapolis "will lose the only native old growth hardwood forest that remains in the inner city." [Filing No. 21 at 17.]

In response, Defendants contend that the decision to prepare an EA rather than an EIS was not arbitrary or capricious. [Filing No. 26 at 11-15.] They emphasize that the Project involves less than 15 acres of land, that some tree buffers and forested areas will be left undisturbed, and that they adequately considered the environmental impacts of the Project. [Filing No. 26 at 12-

---

[4] IFA also argues that Defendants failed to consider the impact of the Project on wetlands on the Property and that they purchased the Property before NEPA review was complete, but those arguments will be addressed in the context of other arguments made by IFA.

13.]  Defendants also emphasize that IFA does not allege or present any new, significant environmental impacts that were not already discussed in the EA.  [Filing No. 26 at 13.]

"NEPA established a national policy of protecting the environment as a way of promoting human health."  *Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998) (citing 42 U.S.C. § 4321). It also created the Council on Environmental Quality ("CEQ"), which promulgates regulations related to NEPA that bind federal agencies.  *Rhodes*, 153 F.3d at 787 (citing 42 U.S.C. § 4342). The regulations promulgated by the CEQ are entitled to substantial deference.  *Ind. Forest All.*, 325 F.3d at 856 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989)).

The fundamental purpose of NEPA is to ensure that agencies consider the environmental consequences of their actions before they act.  *Highway J*, 349 F.3d at 958-59.  NEPA does not mandate particular results; it simply prescribes the necessary process.  *Id.* at 953.  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.*

One process required under NEPA is that all federal agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  *Ind. Forest All.*, 325 F.3d at 856 (citing 42 U.S.C. § 4332(2)(C)) (emphasis omitted).  But an agency is not required to prepare an EIS if the proposed action will not significantly affect the environment.  *Ind. Forest All.*, 325 F.3d at 856.  The CEQ has promulgated regulations to establish procedures for whether to prepare an EIS.  *Id.* (citing 42 U.S.C. §§ 4341-4347; 40 C.F.R. §§ 1500.1-1517).  If a proposed action does not require an EIS but it is also not categorically excluded from the EIS process, the agency must prepare an EA.  *Ind. Forest All.*, 325 F.3d at 856.  An EA is a "concise public document . . . that . . . [b]riefly provide[s] sufficient evidence and analysis for determining

whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a). The purpose of an EA "is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an [EIS]." *Ind. Forest All.*, 325 F.3d at 856.

IFA has not established that Defendants' decision to prepare an EA rather than an EIS was arbitrary or capricious. The Project involves the purchase of less than 15 acres of land in a heavily-wooded section of Crown Hill Cemetery and aims to expand the VA's national cemetery by building columbaria to house the remains of Veterans. An applicable regulation provides that the VA is typically required to prepare an EA but not necessarily an EIS for the "[a]cquisition of land from 5 to 50 acres for development of a VA national cemetery." 38 C.F.R. § 26.6(c)(1)(ii). In fact, the regulation further provides that development of 20 acres of land or less within an existing cemetery is typically a "categorical exclusion . . . for which, therefore, neither an [EA] or an [EIS] is required." 38 C.F.R. § 26.6(b)(1)(vii). IFA completely ignores this regulation.

IFA also ignores that Defendants prepared an EA despite their environmental consultant's conclusion that the Project was a categorical exclusion for which neither an EA nor an EIS was necessary. [Filing No. 20-6.] In December 2013, an Early Coordination Packet was sent to eleven state and federal organizations to solicit feedback on the Project. [Filing No. 20-6 at 14-25.] The environmental consultant analyzed the Project and the feedback and submitted a report to Defendants on February 11, 2014, concluding that the Project qualified for a categorical exclusion from the EA or EIS requirements. [Filing No. 20-6.] Nevertheless, Defendants wanted an EA to be prepared because "public involvement is an important aspect of this project and should be considered in the report." [Filing No. 20-19 at 1.] That process took more than one year and, ultimately, a comprehensive draft EA was completed on June 27, 2015. [Filing No. 20-10.] It analyzed the effect of the Project on, among other things, the environment; wildlife and habitat;

land use; floodplains and wetlands; and community services. [Filing No. 20-10 at 4-6.] The EA concluded "that no significant impacts would be associated" with the Project. [Filing No. 20-10 at 11.] An agency is not required to prepare an EIS if the proposed action will not significantly affect the environment. *Ind. Forest All.*, 325 F.3d at 856.

Ultimately, IFA's argument rests on its fundamental disagreement with the Defendants' ultimate conclusion that the Project will not significantly impact the environment. IFA essentially contends that because it weighs the impact of the factors differently and finds the environmental impact to be significant, an EIS should have been prepared. [Filing No. 21 at 16-21.] That is not the standard to be applied. The fundamental purpose of NEPA is to ensure that agencies consider the environmental consequences of their actions before they act, *Highway J*, 349 F.3d at 958-59, but it does not mandate particular results, *id.* at 953. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* IFA concedes in its brief that the EA "acknowledged . . . the undisturbed nature of this forest at least five times, and acknowledged at least three times the unique nature of the greenspace in which this forest is located." [Filing No. 21 at 18.] That is exactly what NEPA requires an agency to do—consider the environmental consequences of its actions before it acts. Defendants considered the environmental consequences identified by IFA—including that some trees on the Property would be cut down—and made a determination that the environmental impact of the Project was not significant. This decision "implicates substantial agency expertise and is entitled to deference." *Ind. Forest All.*, 325 F.3d at 859.

IFA has not identified a substantial dispute as to the effects of the Project on the environment, such that Defendants' decision to proceed with the Project is arbitrary or capricious.

In fact, IFA's position regarding the environmental impact of the Project is exaggerated. IFA contends that the Project "will clear and transform virtually all of this old growth Forest into a manicured combination of lawn, pavement, building, and cement." [Filing No. 21 at 17.] But the EA noted that the Project will use a "context sensitive design" to "provide protection, in perpetuity, of many natural features in the woodland by retaining old growth trees." [Filing No. 20-10 at 39.] Moreover, since the FONSI issued, Defendants have met with IFA and other interested parties and agreed to take additional steps to preserve the old growth trees with which IFA is concerned. [Filing No. 26 at 15 (citing Filing No. 24-1).] Defendants have agreed to reroute planned roads and fence lines to further minimize tree cutting and to preserve 70% of the trees on the Property between 30 and 40 inches in diameter. [Filing No. 26 at 15 (citing Filing No. 24-1).] Although IFA also argues that the EA fails to properly disclose the Project's impact on wetlands, [Filing No. 21 at 22-24], an updated wetland survey was completed before the draft EA was issued, [Filing No. 20-22 at 52], and the draft EA specifically mentioned "three isolated wetlands" on the Property that would be "avoided, minimized, and/or mitigated for, as needed, based on the projected impacts determined during the design phase[,]" [Filing No. 20-10 at 6]. The Court cautions IFA not to make unsupported, exaggerated assertions in future filings.

For these reasons, the Court concludes that IFA has not met its burden to show that it has some likelihood of success on its argument that Defendants acted arbitrarily or capriciously by finding that the Project had no significant impact on the environment, such that an EIS was not necessary.

### 2) Public Participation

IFA emphasizes that Defendants only solicited the opinions of governmental agencies, arguing that they erroneously failed to hold a public meeting before the draft EA was prepared.

[Filing No. 21 at 6-7.] IFA also challenges the sufficiency of the notices Defendants published in the newspaper, arguing that the notices were intentionally vague because projects previously proposed on the Property had been hotly contested. [Filing No. 21 at 12-15.]

In response, Defendants emphasize that they coordinated with almost a dozen state and federal agencies to solicit feedback on the Project, made the draft EA available for more than thirty days before issuing their final decision, and complied with NEPA's public notice requirements. [Filing No. 26 at 19.] They emphasize that the applicable CEQ regulations do not set forth specific notice requirements and that an agency has "significant discretion" in determining how to comply with NEPA's public participation regulations. [Filing No. 26 at 20.] Although Defendants acknowledge that previously private development projects proposed on the Property had been hotly contested by the public, Defendants reasonably concluded that the cemetery expansion Project would not generate such controversy "because it did not involve private residential and business development, but is merely a continued use of the very thing the property is already zoned for—cemetery use." [Filing No. 26 at 22.] Defendants also emphasize the public benefit to Veterans' families and that the Project's design would create a peaceful, reflective environment. [Filing No. 26 at 23.]

An agency that prepares an EA "shall involve environmental agencies, applicants, and the public, to the extent practicable." 40 C.F.R. § 1501.4; *see also* 38 C.F.R. § 26.9(a) (VA regulation stating that during the preparation of environmental documents, the VA "shall include the participation of environmental agencies, applicants, State and local governments and the public to the extent practicable and in conformance with CEQ Regulations"). That said, the agency has "significant discretion in determining" how to comply with NEPA's public participation regulations when preparing an EA. *Coalition to Protect Cowles Bog Area v. Salazar*, 2013 WL

3338491, at *13 (N.D. Ind. 2013) (citing *Mich. Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)).

Defendants solicited the opinions of almost one dozen state and federal agencies regarding the cemetery expansion Project. [Filing No. 20-6 at 13-25.] IFA does not argue that they should have solicited more agency opinions or that their failure to do so was arbitrary or capricious. Instead, IFA focuses on Defendants' failure to hold a public meeting before issuing the draft EA and the allegedly insufficient notices Defendants published in the newspaper regarding the draft EA and the FONSI. While IFA may have preferred a public meeting to be held, it does not cite any authority requiring such a meeting before a draft EA is issued for public comment. [Filing No. 21 at 10-15.] IFA argues, without citation to record evidence, that Defendants did not hold a public meeting because of public controversy that had stalled previous development projects on the Property. [Filing No. 21 at 19-21.] But the previous projects involved private residential and business development, while Defendants' Project is a continued use of the cemetery that the Property is zoned for, which Defendants reasonably concluded the public would support because of the benefits to Veterans and the public. [Filing No. 26 at 22-23.] Defendants' rationale is entitled to deference and is not arbitrary or capricious just because IFA disagrees with it.

The VA's NEPA guidance guide confirms that Defendants had discretion to determine how to involve the public with the draft EA:

> Whether VA prepares a CATEX[5], EA, or EIS, each of these processes should involve some form of **public involvement**. This could mean posting a CATEX on a website, inviting the public to comment on an EA, conducting a public meeting, or publishing a Notice of Availability for an EIS in the Federal Register.

---

[5] CATEX is the abbreviation for categorical exclusion.

[Filing No. 20-27 at 10 (original emphasis).]  The guide also provides that the public should be given thirty days to comment on a notice of availability of a draft EA.  [Filing No. 20-27 at 28.]

To provide notice to the public and solicit feedback, Defendants placed copies of the draft EA at the Central Branch of the Indianapolis Public Library, the College Avenue Branch of the Indianapolis Public Library, and at Crown Hill Cemetery.  [Filing No. 20-33 at 6.]  Additionally, a Notice of Availability was published in the *Indianapolis Star* newspaper from July 22, 2015 until August 1, 2016. [Filing No. 20-33 at 6.]  It provided that a draft EA for the "[p]roposed property acquisition for cemetery expansion and development of Crown Hill National Cemetery in Indianapolis, Marion County, Indiana" was available.  [Filing No. 20-33 at 6.]  It also provided for a 30-day comment period.  [Filing No. 20-33 at 6.]  Defendants argue that the published Notice of Availability was insufficient to convey that trees would be cut down for the Project.  [Filing No. 20-33 at 6.]  While the Notice of Availability of the draft EA did not reference that specific environmental impact of the Project, IFA points to no requirement that a proposed project must be described in a certain amount of detail.  Moreover, as IFA has conceded, the Project's environmental effect on the trees on the Property was referenced multiple times in the EA.  [Filing No. 21 at 18 (IFA's brief conceding that the draft EA "acknowledged . . . the undisturbed nature of this forest at least five times, and acknowledged at least three times the unique nature of the greenspace in which this forest is located").]  Thus, IFA has not identified any additional evidence or considerations it would have provided in response to the draft EA had the Notice of Availability been more specific.

On September 8, 2015, more than thirty days after the Notice of Availability of the draft EA was published, Defendants adopted the FONSI.  [Filing No. 20-36.]  A Notice of Availability regarding the EA and FONSI was then published in the *Indianapolis Star* newspaper from

September 12, 2015 until September 21, 2015, providing a public comment period until October 13, 2015. [Filing No. 20-33 at 3.] That Notice of Availability specifically identified the Project and the environmental impact as follows:

> Under the Proposed Action, VA would purchase a 14.75-acre wooded parcel north of the existing national cemetery. The proposed expansion project would create an entrance and roadway system to accommodate the construction of columbarium walls, a main flagpole area, and a small public information and restroom building. The cemetery would be developed in phases with each phase accommodating approximately 10 years of cremation capacity. Existing forested areas will be removed as each phase of development occurs; there will be some tree buffers and forested areas left undisturbed to retain the character and serenity of the site.
>
> The purpose of the Proposed Action is to continue to enable the NCA to provide eligible Veterans and their families with a national cemetery of sufficient size and capacity to serve the projected needs in the central Indiana region for the next 100 years.

[Filing No. 20-33 at 3.] IFA criticizes this Notice of Availability for "fail[ing] to describe the parcel or differentiate it from the other non-old growth wooded lands adjacent to the Forest and inside the Crown Hill Cemetery." [Filing No. 21 at 13.] IFA cites no authority for such a specific description requirement in the Notice of Availability.

IFA argues that Defendants violated NEPA by closing on the Property before the public comment period from the second Notice of Availability had closed. [Filing No. 21 at 15-16.] The VA purchased the Property on September 21, 2015, which was twenty-two days before the public comment period closed on October 13, 2015. [Filing No. 20-5 at 1.] This was not a NEPA violation, as Defendants point out, because the applicable regulation merely requires "the necessary environmental documents [to] be completed" before the purchase. 38 C.F.R. § 26.7(b). Because the EA and the FONSI were completed before the VA's purchase of the Property, NEPA was not violated.

Alternatively, even if Defendants' purchase of the Property before the expiration of the thirty-day comment period was a NEPA violation, NEPA violations are subject to harmless error

review.  *See* *Miami Nation of Indians of Ind., Inc. v. U.S. Dep't of the Int.*, 255 F.3d 342, 351 (7th Cir. 2001) (holding that the doctrine of harmless error is applicable to review of administrative decisions) (citing 5 U.S.C. § 706(2)(F)); *see also* *United States v. Coalition for Buzzards Bay*, 644 F.3d 26, 37 (1st Cir. 2011) ("NEPA violations are subject to harmless error review"); *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 432 (4th Cir. 2012) (same).  IFA cites no evidence that additional public comments were received between the purchase and the end of the public comment period, much less any public comments addressing concerns about the Project that were not already identified in the EA and FONSI.

For these reasons, the Court concludes that IFA has not met its burden to show that it has some likelihood of success on the merits of its arguments regarding the adequacy of the public notice provided or the timing of the VA's purchase of the Property.

### 3) No Hard Look at Alternatives

IFA argues that Defendants erred by failing to adequately consider alternatives to the Project other than just a "no action" alternative.  [Filing No. 21 at 21-22.]  While IFA concedes that an EA "generally imposes less stringent requirements on an agency than an EIS, it is clear that even an EA's 'hard look' must include consideration of reasonable alternatives."  [Filing No. 21 at 22.]

In response, Defendants point out that NEPA does not contain a requirement regarding the number of alternatives to be considered.  [Filing No. 26 at 15-16.]  They also emphasize the unique attributes of the Property, which is already zoned for cemetery use and only one mile north of the existing National Cemetery.  [Filing No. 26 at 17.]

NEPA expressly states that "[n]o specific number of alternatives is required or prescribed" for an EA.  36 C.F.R. § 220.7(b).  Given this clear language, Defendants' decision to consider only

a no action alternative in addition to the Project was not arbitrary or capricious. [Filing No. 20-10.] The EA thoroughly analyzed the impact of the proposed action and the no action alternative. [Filing No. 20-10 at 5-6.] With regard to the no action alternative, the EA took a hard look and found as follows:

**2.2.2 No Action**

The No Action alternative serves as a benchmark against which the effects of the Proposed Action can be evaluated. For this project, No Action is defined as not purchasing the 14.75 acre wooded parcel in Crown Hill Cemetery.

The No Action alternative would challenge NCA's goal of providing eligible Veterans with reasonable access to VA burial options in the central Indiana area and, therefore, would not meet the purpose and need for action. Veterans and their families residing in the Indianapolis metropolitan area would be underserved and require Veterans and their families to travel in excess of 50 miles and over one hour drive time to Marion National Cemetery or to use a private cemetery. The distribution of national cemeteries in the region would be unequal, and VA would not be in compliance with the requirements of the *Service Members Civil Relief Act*. Furthermore, the No Action alternative would create a hardship for the survivors attending the funerals and for visitations of deceased veterans interred in other national cemeteries, because of the distances between homes and the burial sites. If Veterans and their families must resort to private burials, they are deprived of the honor and privilege bestowed upon them by a grateful nation for their service to the United States of America.

[Filing No. 20-10 at 19.]

IFA has not met its burden of proving that Defendants' decision to only analyze a no action alternative in addition to the proposed Project was arbitrary or capricious. This conclusion is bolstered by the unique characteristics of the Property—namely, its proximity to an established national cemetery and the fact it was already zoned for cemetery use. For these reasons, the Court concludes that IFA has not proven a likelihood of success on the merits on this argument.

### C. Irreparable Harm and Adequacy of Remedy at Law

By seeking a preliminary injunction, IFA carries the burden to establish that it has "no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied." *Stuller*, 695 F.3d at 678. IFA does not present any evidence or argument on this point, instead summarily concluding that because the Project would involve cutting down trees, "[t]his

announced plan alone satisfies the second and third prong of the test for granting" the injunction request. [Filing No. 21 at 4.]

In response, Defendants contend that IFA has not established irreparable harm because it has not submitted any evidence that imminent, irreparable harm is likely to occur before the Court rules on the merits of the case. [Filing No. 26 at 29.] While Defendants concede that environmental injury can by its nature be permanent and not adequately remedied with money, Defendants emphasize that the Project will not involve cutting down all of the trees on the Property and that since the FONSI was issued, Defendants have met with IFA and agreed to changes to preserve 70% of the trees on the Property between 30 and 40 inches in diameter. [Filing No. 26 at 29-30.] Finally, Defendants point out that NEPA is aimed at making sure decision-makers take environmental factors into account, but it does not strictly foreclose a project with an environmental impact. [Filing No. 26 at 30-31.]

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) (citations omitted). For preliminary relief to be granted, however, the irreparable harm must also be likely and "be more than a mere possibility that the harm will come to pass." *Id.*

The Court is puzzled by IFA's assumption that because the Project will result in trees being cut down, IFA need not present any evidence or develop an argument on the irreparable harm factor. This is particularly troublesome because the Project's environmental impact is not nearly as significant as IFA alleges. The EA stated that the Project will use a "context sensitive design" to "provide protection, in perpetuity, of many natural features in the woodland by retaining old

growth trees." [Filing No. 20-10 at 39.] Moreover, Defendants have met with IFA since the FONSI and further modified the Project to save 70% of the larger trees on the Property.

It is undisputed, however, that some trees on the Property will be cut down for the Project and that Defendants plan to begin doing so on January 15, 2017. Defendants must start their work soon to complete it by April 1, 2017, so that they do not interfere with the roosting period of an endangered bat in the area. Given these undisputed facts and that summary judgment briefing will not be completed until the end of March 2017, [Filing No. 9 at 3], the Court concludes that without an injunction, it is likely that IFA will suffer some irreparable harm for which there is not an adequate remedy at law before the merits of the case are decided.

### D. Effect of Findings

The Court only proceeds to the balancing phase of the analysis if a plaintiff satisfies all requirements of the "threshold phase" for obtaining a preliminary injunction. *Girl Scouts*, 549 F.3d at 1086. Here, the Court has found that IFA has failed to carry its burden on one of the threshold requirements for obtaining injunctive relief—namely, that it has some likelihood of success on the merits of its claims. Thus, the Court "must deny the injunction." *Id.* (holding that if the Court determines that the moving party has failed to demonstrate any one of the threshold requirements, "it must deny the injunction") (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 19 (7th Cir. 1992) (holding that a plaintiff's failure to demonstrate one of the threshold elements "dooms a plaintiff's case and renders moot any further inquiry")).

Even if the Court did proceed to the balancing phase of the analysis, injunctive relief still would be denied because "[t]he district court must also consider the public interest in granting or denying an injunction." *Stuller*, 695 F.3d at 678. IFA completely ignores the public interest portion of the injunction analysis and apparently assumes that the public has no interest in the

Project proceeding. It is clear from the record, however, that the public—here, at the very least, families of deceased Veterans—does have an interest in the Project proceeding because it will create burial space for Veterans who have served our country and the current national cemetery in Indianapolis is at capacity. While some trees would be cut down to facilitate the Project, IFA ignores that 70% of the larger trees will remain and that the Project will result in a solemn space surrounded by nature that the public can enjoy. IFA's failure to acknowledge any of the public interests that compete with its position is unacceptable and would result in an adverse finding if the Court reached the balancing phase of the analysis, given that IFA bears the burden of proving that the injunction it seeks is necessary.

## IV.
### CONCLUSION

The Seventh Circuit has emphasized that "a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts, 549 F.3d at 1085*. IFA has not met its burden to show that this is such a case. For the reasons detailed herein, the Court **DENIES** the Motion for Preliminary Injunction. [Filing No. 17.] This matter will proceed with summary judgment briefing, although the Court asks the assigned Magistrate Judge to hold a conference with the parties to determine if the parties can reach an agreed resolution.

Date: 1/13/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**<u>Electronic Distribution via CM/ECF:</u>**

W. Russell Sipes
THE SIPES LAW FIRM
sipeslaw@aol.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov